UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x
                                                :

In re:                                  :    Chapter 7
                                                :

CHOWAIKI & CO. FINE ART LTD.,      :    Case No. 17-13228 (MKV)
                                                :

                         Debtor.    :
                                                :

-------------------------------------------------------------- x
                                                :

SHAY ROSEN,                    :
                                                :

                         Plaintiff,    :    Adv. Pro. No. 17-01242 (MKV)
                                                :

                    v.                :
                                                :

CHOWAIKI & CO. FINE ART LTD.,      :
                                                :

                         Defendant.   :

-------------------------------------------------------------- x

## AMENDED ERRATA ORDER (ATTACHING CORRECTED OPINION)

    **ORDERED** that the Court's Opinion and Order granting Defendant's Motion to Dismiss entered on November 16, 2018 [ECF No. 42] be corrected as follows:

    On page 32, the phrase "the transaction involving the Kandinsky was an arms-length commercial transaction and a joint venture." is deleted and replaced with "the transaction involving the Kandinsky was an arms-length commercial transaction and not a joint venture."

    For convenience, a copy of the Opinion and Order, incorporating the corrections listed in

this Order, is attached as Exhibit "A" to this Order.


**It is so ordered.**


Dated: New York, New York
          November 20, 2018

                                                          *s/ Mary Kay Vyskocil*
                                            Honorable Mary Kay Vyskocil
                                            United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------- x
                                              :
In re:                                        :   Chapter 7
                                              :
CHOWAIKI & CO. FINE ART LTD.,                 :   Case No. 17-13228 (MKV)
                                              :
                         Debtor.              :
                                              :
------------------------------------------------------------- x
                                              :
SHAY ROSEN,                                   :
                                              :
                         Plaintiff,           :   Adv. Pro. No. 17-01242 (MKV)
                                              :
              v.                              :
                                              :
CHOWAIKI & CO. FINE ART LTD.,                 :
                                              :
                         Defendant.           :
------------------------------------------------------------- x
```

## MEMORANDUM OPINION AND ORDER
## <u>GRANTING MOTION TO DISMISS</u>

*A P P E A R A N C E S:*

LAW OFFICE OF MATTHEW C. HEERDE
*Attorneys for Shay Rosen*
222 Broadway, 19th Floor
New York, New York 10038
By:    Matthew C. Heerde
       Arthur Palmieri

TOGUT, SEGAL & SEGAL LLP
*Counsel to the Chapter 7 Trustee, Albert Togut*
One Penn Plaza, Suite 3335
New York, New York 10119
By:    Neil Berger
       Minta Nester

**MARY KAY VYSKOCIL**
**UNITED STATES BANKRUPTCY JUDGE**

Shay Rosen ("Rosen" or "Plaintiff") commenced this action (the "Adversary

Proceeding") seeking a declaratory judgment that Chowaiki & Co. Fine Art Ltd. (the "Gallery"

or "Debtor"), acting through one of its principals, Ezra Chowaiki ("Chowaiki"), fraudulently

induced Rosen to transfer $230,000 (the "Wired Funds") to the Gallery's bank account pre-

petition. *See* First Amended Adversary Complaint For Declaratory Judgment; Imposition of

Constructive Trust; And Turnover of Funds (the "Amended Complaint" or "Am. Compl.") [ECF

No. 5], ¶¶ 37-43 (Count One).  Rosen also seeks a declaration that the Wired Funds are not

property of the Gallery's bankruptcy estate within the meaning of section 541(d) of the

Bankruptcy Code, (Am. Compl. ¶¶ 44-48) (Count Two), and the imposition of a constructive

trust for the benefit of Rosen and turnover of the Wired Funds.  (Am. Compl. ¶¶ 49-53) (Count

Three).

Albert Togut, not individually but solely in his capacity as Chapter 7 trustee (the

"Trustee") of the Gallery, moved to dismiss this adversary proceeding pursuant to Rules 9(b) and

12(b)(6) of the Federal Rules of Civil Procedure.[1]  *See* Motion to Dismiss the First Amended

Complaint for Declaratory Judgment; Imposition of Constructive Trust and Turnover of Funds

(the "Motion to Dismiss") [ECF No. 6].  Rosen filed a Memorandum of Law in Opposition to the

Motion to Dismiss (the "Opp. Memo") [ECF No. 14], to which the Trustee filed a Reply in

response [ECF No. 15].  The Court heard oral argument on the Motion to Dismiss (the "First

---

[1] On February 8, 2018, the Court granted the Motion of Bogomila Welsh-Ovcharov for Limited Intervention in Support of the Trustee's Motion for Dismissal of the First Amended Complaint of Plaintiff Shay Rosen [ECF No. 9], allowing Bogomila Welsh-Ovcharov to intervene in this adversary proceeding for the limited purpose of supporting the Motion to Dismiss.  *See* Order Granting Motion of Bogomila Welsh-Ovcharov for Limited Intervention [ECF No. 18].  Welsh-Ovcharov filed a Joinder Motion in support of the Trustee's Motion to Dismiss [ECF No. 16] and was represented by counsel at the First Hearing.

2

Hearing" or "First Hr'g") and, at the close of the Hearing, requested supplemental briefing on

whether Rosen had standing to initiate this adversary proceeding. Thereafter, the Court held

another hearing on the Motion to Dismiss (the "Second Hearing" or "Second Hr'g").

Having considered all arguments raised by the parties, for the reasons set forth below, **the

Motion to Dismiss is GRANTED** under Rule 12(b)(6) on the ground that Rosen has failed to

state a claim upon which relief can be granted.

## JURISDICTION AND VENUE

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334

and 157(a) and the Amended Standing Order of Referral of Cases to Bankruptcy Judges of the

United States District Court for the Southern District of New York (M-431), dated January 31,

2012 (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(a). Venue is

proper pursuant to 28 U.S.C. § 1409. Both the Trustee and Rosen have consented to the entry of

a final order or judgment by this Court. *See* Statement of Consent to Final Orders or Judgment

[ECF No. 27]; Trustee's Standing Memo at 15 n.6; First Hr'g Tr. 20:1-23 [ECF No. 21].

## BACKGROUND

**A.    Chowaiki and Rosen's Pre-Petition Transaction**

For purposes of the Motion to Dismiss, the Court accepts as true the following facts as

alleged in the Amended Complaint (and the exhibits thereto)[2] and the Supporting Declarations.

*See Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001).

---

[2] For purposes of a rule 12(b)(6) analysis, a complaint is "deemed to include any written instrument attached to it as
an exhibit or any statements or documents incorporated in it by reference." *Cortec Indus. V. Sum Hldg. L.P.*, 949
F.2d 42, 77 (2d. Cir. 1991).

Rosen is an Israeli national and operates an art consulting business. Rosen Decl. ¶ 1. On or around October 11, 2017, Rosen was introduced to Chowaiki through a mutual colleague, Christine Barberi ("Barberi"). Am. Compl. ¶ 11. Rosen had known Barberi for around 10 years and previously had completed art transactions with her. *Id*. Barberi suggested to Rosen the possibility of entering into a transaction with the Gallery, through Chowaiki, with regard to a watercolor and ink painting entitled *Schichtenweise* by the late Russian Expressionist-Abstract painter Wassily Kandinsky (the "Kandinsky"). *Id*. ¶ 1, 11. In an email dated October 11, 2017, Barberi explained to Rosen that the Gallery was "looking to either sell [the Kandinsky] and make a profit or buy it from [its] current owner and share the investment with a partner and then resell [it] and make a substantial profit." *Id*. ¶ 11. Barberi stated that "time was of the essence" because Chowaiki was concerned that "another buyer [would] buy it before he [got] the funds together." *Id*. Barberi represented to Rosen that Chowaiki was trustworthy and that they were close friends, having engaged in "a lot of business together [in the past]." *Id*.

Rosen spoke with Chowaiki by telephone on October 12, 2017, whereupon they discussed the Kandinsky offer and Chowaiki proposed that Rosen could participate in a joint purchase of the *Schichtenweise* painting with Barberi and the Gallery. *Id*. ¶ 12. After the phone call, Chowaiki sent Rosen a follow up email discussing the terms of the offer. *Id*. ¶ 13; *see id*. Exh. A (Chowaiki email to Rosen). In the email, Chowaiki estimated that he could obtain the painting for about one million dollars and stated that he was willing to sell a half share in the piece. Exh. A. Chowaiki further represented in the email that he believed the painting could be resold "for anywhere between $1.5-2m." and that "[o]f course, Christine [Barberi needs] to be added on top." [3] *Id*.

---

[3] According to the Amended Complaint, this was not the Gallery's first agreement made with an investor to jointly purchase and sell the Kandinsky. Previously, around September 28, 2017, Chowaiki had executed a joint venture

Chowaiki sent Rosen another email on October 20, 2017, stating that he "[had] a client already interested in the picture. It looks like he will be willing to pay $1.2m to own it outright and he will let me resell it one day when he feels like selling it." *Id.* ¶ 14. Chowaiki clarified that the Gallery would be required to pay $950,000 to buy the painting before re-selling it for $1.2 million and that if Rosen was interested in participating they could make the return proportional. *Id.* After engaging in negotiations, Rosen and Chowaiki agreed that for a 24% interest in the Kandinsky, Rosen would pay $230,000. *Id.*

On October 23, 2017, Rosen caused $230,000 (the "Wired Funds") to be transferred from his wife's bank account (the "Bank Account" or "Account") to the Gallery's bank account in New York. *Id.* ¶ 16; *see also id.* at Exh. B (Wire Transfer Confirmation). Rosen did not hear from Chowaiki again after transmitting the Wired Funds. *Id.* ¶ 17.

By November, the Gallery was facing multiple lawsuits from numerous creditors. *Id.* ¶¶ 28-31. On or around November 9, 2017, Barberi contacted Rosen to tell him that the Gallery had been closed and was filing for bankruptcy. *Id.* ¶ 19. In addition, she reported that Chowaiki and the Gallery's majority owner, David Dangoor, were being accused of fraud in which they had allegedly lured investors and collectors into paying money for artworks by renowned artists that neither the Gallery nor its principles owned or had any right to sell. *Id.*; *see also id.* at 6 n.1. By November 4, 2017, any opportunity the Gallery had of acquiring the Kandinsky had evaporated when, because of Chowaiki's non-response to his emails, the seller of the Kandinsky took the painting elsewhere. *Id.* Exh. D (Email from Carosso to Chowaiki).

---

agreement to purchase "the very same Kandinsky 50%-50% with Carpenter Fine Violins & Collectibles LLC for a total price of $625,000." Am. Compl. ¶ 24; *see also id.* Exh. C (Joint Venture Agreement). Pursuant to this joint venture agreement, the Gallery had committed itself to acting as the joint venture's principal agent and was responsible for both the purchase of the painting as well as its sale for the benefit of the two parties. *Id.* Exh. C.

On December 12, 2017, the United States Attorney for the Southern District of New

York commenced a criminal case against Chowaiki: *USA v. Chowaiki*, Case No. 1:18-cr-00323-

JSR (the "Criminal Case").  On May 3, 2018. Chowaiki pled guilty for having "devised a scheme

and artifice to defraud and for obtaining money and property by means of false and fraudulent

pretenses . . ." involving at least twenty-five pieces of art.  Criminal Case, Dkt No. 15.

**B.      Bankruptcy**

On November 13, 2017 (the "Petition Date"), the Gallery filed a voluntary petition for

relief pursuant to chapter 7 of Bankruptcy Code and, on the following day, Albert Togut was

appointed chapter 7 trustee. Soon thereafter, on November 27, 2017, the Gallery filed its

schedules of assets and liabilities, listing assets of $276,681.59 and liabilities of $11,877,011.03.

*See* Summary of Assets and Liabilities for Non-Individuals [Case No. 17-13228, ECF No. 7].

**C.      Adversary Proceeding**

Shortly after the Petition Date, Rosen initiated this adversary proceeding[4] seeking: (i) a

declaratory judgment finding that the Gallery had fraudulently induced Rosen to transfer the

Wired Funds to the Gallery's bank account in New York ("Count I"); (ii) a declaratory judgment

that under both section 541(d) of the Bankruptcy Code and New York state law, the Gallery has

no equitable interest in the Wired Funds and thus they are not part of the Gallery's bankruptcy

estate ("Count II"); and (iii) the imposition of a constructive trust and the immediate turnover of

the Wired Funds to Rosen ("Count III").  Am. Compl. at 12.  In lieu of an answer, the Trustee

moved to dismiss under Rules 9(b) and 12(b)(6).

---

[4] Rosen initially filed a Complaint [ECF No. 1], in response to which the Trustee filed a Motion to Dismiss [ECF No. 3].  Rosen subsequently filed the Amended Complaint [ECF No. 6], which is the pleading at issue on this motion.

At the hearing on the Motion to Dismiss, the Trustee raised the issue of Rosen's standing to bring this adversary proceeding.  *See* First Hearing Tr. 21-22:20-7.  The Trustee argued that it was unclear who was the real party in interest in this case, since the Wired Funds had been transferred from a bank account belonging to Rosen's wife, rather than Rosen himself.  *See id.* 23:7-13.  While Rosen conceded that the Wired Funds were transferred from his wife's account, he maintained that he had standing because the Wired Funds in fact belonged to him, notwithstanding the name on the account.  *See id.* 41:6-13.  Rosen also argued that as husband and wife, he and the account owner should be considered one economic unit.  *See id.* 42-43:24-1.

Because the standing issue was first introduced at the First Hearing, the Court ordered supplemental briefing regarding the standing issue.[5]  *See id*. 68-69:23-10; So-Ordered Stipulation Scheduling Supplemental Briefing [ECF No. 19].  After further briefing on standing, the Court held a Second Hearing on the Motion to Dismiss.

(i)    The Record with Respect to the Bank Account
        from which the Funds were Transferred

It is undisputed, and the evidence submitted in connection with the supplemental briefing on the standing issue confirms, that the Bank Account from which Rosen caused the Wired Funds to be transferred is an account at Edmond de Rothschild Bank registered in the name of Orian Levin, who is Rosen's wife.  *See* Rosen Decl. ¶¶ 3-4; Levin Decl. ¶¶ 3-4.  Levin opened

---

[5] On February 12, 2018, the Court "So-Ordered" a Stipulation Scheduling Supplemental Briefing [ECF No. 19], which, *inter alia*, required the Trustee and Rosen to file simultaneous briefing regarding Rosen's standing to commence this adversary proceeding.  Accordingly, the Trustee filed the Trustee Standing Memo and Rosen filed the Memorandum of Law Regarding Plaintiff Shay Rosen's Standing (the "Rosen Standing Memo") [ECF No. 23], which was supported by three declarations: (i) Declaration of Matthew C. Heerde ("Heerde Decl.") [ECF No. 24]; (ii) Declaration of Shay Rosen ("Rosen Decl.") [ECF No. 25]; and (iii) Declaration of Orian Levin ("Levin Decl. together with the Heerde Decl. and the Rosen Decl., the "Supplemental Declarations.") [ECF No. 26].  Although not authorized, the Trustee and Rosen each filed two reply briefs in connection with the standing issue.  *See* Trustee's Reply Memorandum of Law Regarding Plaintiff's Lack of Standing ("Trustee 1st Standing Reply") [ECF No. 28]; Reply Memorandum of Law Regarding Plaintiff Shay Rosen's Standing ("Rosen 1st Standing Reply") [ECF No. 29]; Supplemental Briefing Concerning Plaintiff Shay Rosen's Standing ("Rosen 2nd Standing Reply") [ECF No. 33]; Reply to Plaintiff's Supplemental Briefing Concerning Plaintiff Shay Rosen's Standing ("Trustee 2nd Standing Reply") [ECF No. 34].

the Bank Account on March 12, 2006, and on the same day she, granted Rosen power of attorney

over the Bank Account.  *See* Heerde Decl. Exh. A; Levin Decl. Exh. A.  Additionally, on July

21, 2011, Rosen and Orion Levin filed with the Bank a document called Form A – Declaration of

Identity of the Beneficial Owner, which listed both Rosen and Levin as beneficial owners of the

funds in the Account.  *See* Levin Decl. Exh. C (Form A).

      Rosen and Levin have each submitted declarations attesting that although the Bank

Account is in Levin's name, they "consider[ed] all the funds in the Account to be joint property"

and that it is their "mutual understanding that each of [them is] equally entitled to use all the

funds in the Account."  Rosen Decl. ¶ 7.  *See also* Levin Decl. ¶ 8 ("Shay [Rosen] and I consider

all funds in the Account to be our joint property. It is our mutual understanding that each of us

are equally entitled to use all the funds in the Account.").  Each also attested that Rosen manages

the Account, communicates with the Bank regarding the Account, and uses funds in the Account

in his discretion, for example, by executing withdrawals and deposits for purchases and sales of

art relating to his art business.  *See* Rosen Decl. ¶ 8; Levin Decl. ¶ 9.

      (ii)    <u>Supplemental Briefings on the Issue of Standing</u>

      In his supplemental memorandum on the standing issue, the Trustee contends that Rosen

lacks standing because both the complaint and the attached exhibits demonstrate that the Wired

Funds – the subject of this adversary proceeding – were transferred from Levin's account, and

therefore, Rosen could not allege injury to property in which he held an interest.  *See* Trustee's

Standing Memo. ¶16.  The Trustee argues that New York law presumes that once funds are

deposited into a bank account, the account holder is the party that has title to those funds.  *Id.*

¶17.[6]  The Trustee also disputes Rosen's assertions that a husband and wife should be

---

[6] Rosen concedes that the New York state law presumption of ownership pertaining to funds deposited in a bank
account applies to the Bank Account,  *see* Rosen 2nd Standing Reply at 2 ("For purposes of the Court's

considered one economic unit. *Id.* ¶ 20.  Moreover, the Trustee argues, leave to further amend should not be granted on the grounds of futility, since even if Levin were to be substituted as the named plaintiff, she would be unable to factually maintain the causes of action that Rosen pleads since there were no allegations that Chowaiki made any (mis)representations to her upon which she relied. *Id.* ¶ 29, 31.

Rosen argues in his supplemental memorandum that his allegations, if taken as true, are sufficient to establish standing. *See* Rosen's Standing Memo. at 3.  In connection with his supplemental briefing, Rosen filed his declaration and a declaration from his wife.  Rosen also supplemented the record with documentation reflecting that he has power of attorney over the account, and that he is listed as a beneficial owner of the account pursuant to the Form A document. *See* Levin Decl. Exh. A.  Rosen argues that, taken in its totality, this evidence demonstrates that he has a sufficient interest in the Account to satisfy the injury-in-fact requirement for standing.  Rosen Standing Memo at 3-4.

In reply, the Trustee disputes the significance of Rosen's supporting documents.  Reply to Plaintiff's Supplemental Briefing Concerning Plaintiff Shay Rosen's Standing § I ¶2, § II ¶8-11 ("Trustee 2nd Standing Reply") [ECF No. 34].  The Trustee argues that the designation of Rosen as a "beneficial owner" on Form A is simply a banking formality required by Swiss authorities as part of their anti-money laundering statutes; it does not equate to an ownership interest sufficient enough to confer standing to bring an adversary proceeding.[7]  Trustee 2nd

---

determination on standing, Rosen concedes that the rebuttable presumption under New York law regarding title to funds deposited in a bank account applies in this case, even though the Wired Funds originate from a Swiss bank account."), but contends that he has rebutted the presumption that the Funds belong solely to his wife.

[7] Although Rosen argues that Form A supported his and his wife's oral agreement that the money in the account was jointly owned, Rosen concedes that the ultimate purpose of Form A is related to money laundering regulations. Second Hearing Tr. 39:17-19.  Further, Rosen concedes that Form A is likely required whenever any person or entity holds a power of attorney over a bank account in which they are not the named owner. *Id.* 40:49.

Standing Reply at § III.  The Trustee references the definition of "beneficial owner" set out by

the Financial Action Task Force, an inter-governmental body that develops policies to protect

against money laundering:

> The natural person(s) who ultimately owns or controls a customer
> and/or the natural person [on] whose behalf a transaction is being
> conducted.  It also includes those persons who exercise ultimate
> effective control over a legal person or arrangement.

*Id*. ¶ 14; *see* FATF, *International Standards on Combating Money Laundering and the*

*Financing of Terrorism and Proliferation: The FATF Recommendations*, at 111 (2012).  The

Trustee argues that the "beneficial owner" designation merely refers to the entity that exercises

control over the legal owner of the account; however, such control over the legal person does not

equate to legal ownership for the purposes of standing.  *Id*.  Similarly, the Trustee emphasizes

that the policy behind requiring account holders to name "beneficiary owners" is to combat

money laundering, not to construe civil ownership of funds.  *Id*. ¶ 15.  Thus, the Trustee argues,

the "beneficiary owner" designation does not stand for the proposition that Rosen has a property

interest in the funds in the account. *Id*.


## LEGAL STANDARDS

### A.   Rules 12(b)(1) and 12(h)(3) of the Federal Rules of Civil Procedure

Standing to maintain an adversary proceeding is assessed as a matter of subject matter

jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, made applicable

to this adversary proceeding pursuant to Rule 7012 of the Federal Rules of Bankruptcy

Procedure.  *In re Magnesium Corp. of Am.*, 583 B.R. 637, 646 (Bankr. S.D.N.Y. 2018) (citing

*All. For Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 87–88 (2d Cir. 2006)).

Article III standing is a prerequisite for jurisdiction.  *See, e.g., Fulani v. Bentsen*, 35 F.3d 49, 51 (2d Cir. 1994); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  Questions of subject matter jurisdiction are threshold issues that must examined by the Court before any other issue is resolved. *See, e.g., Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1999).   In the absence of such jurisdiction, federal courts lack the power to adjudicate the merits of the case, and "the only function remaining to the court is that of announcing the fact and dismissing the cause." *Id.* at 94.

Federal Rule of Civil Procedure 12(h)(3) provides that "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."  Fed. R. Civ. P. 12(h)(3); *see Liranzo v. United States,* 690 F.3d 78, 83 (2d Cir. 2012)*.*  Subject matter jurisdiction may not be waived and can be raised at any time prior to final judgment.  *Grupo Dataflux v. Atlas Glob. Grp., L.P.,* 541 U.S. 567, 571 (2004).  Significantly, a party of interest can raise the issue of subject matter jurisdiction without a formal motion and, if found to be valid, the court is obligated to dismiss the case *sua sponte.  See Bernstein v. Universal Pictures, Inc.,* 517 F.2d 976, 979 (2d Cir. 1975) ("[L]ack of jurisdiction is so fundamental a defect that the rule permits a judge to recognize it *sua sponte* at any time."); *see also* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1393 (Waiver of Certain Defenses—Rule 12(h)(3)) (3d ed. 2018).

The analysis for determining subject matter jurisdiction is the same pursuant to both Rule 12(b)(1) and Rule 12(h)(3).  *See Cruz v. AAA Carting & Rubbish Removal, Inc*., 116 F. Supp. 3d 232, 239 (S.D.N.Y. 2015) ("[T]he difference between a motion made under Rule 12(b)(1) and one made under Rule 12(h)(3) is largely academic, and the same standards are applicable to both types of motions.") (quotations and citations omitted).  In deciding a Rule 12(b)(1) motion to

11

dismiss, the party that invokes federal jurisdiction bears the burden of establishing the elements

of standing. *Lujan*, 504 U.S. at 561. Courts "must take all uncontroverted facts in the

complaint . . . as true, and draw all reasonable inferences in favor of the party asserting

jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir.

2014). However, jurisdiction "must be shown affirmatively, and that showing is not made by

drawing from the pleadings inferences favorable to the party asserting it." *APWU v. Potter*, 343

F.3d 619, 623 (2d Cir. 2003). In ruling on subject matter jurisdiction under Rule 12(b)(1), a

court may refer to evidence outside the pleadings. *Makarova v. United States*, 201 F.3d 110, 113

(2d Cir. 2000); *see Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253

(2d Cir. 2000) ("On a Rule 12(b)(1) motion challenging the district court's subject matter

jurisdiction, the court may resolve the disputed jurisdictional fact issues by referring to evidence

outside of the pleadings, such as affidavits, and if necessary, hold an evidentiary hearing.").


**B.      Rule 12(b)(6) of the Federal Rules of Civil Procedure**

Rule 7012(b) of the Federal Rules of Bankruptcy Procedure makes Rule 12(b)(6) of the

Federal Rules of Civil Procedure applicable to adversary proceedings. On a Rule 12(b)(6)

motions to dismiss for failure to state a claim for relief, a court must accept as true all material

facts alleged in the complaint and draw all reasonable inferences in favor of the plaintiff. *See*

*Walker v. City of New York*, 974 F.2d 293, 298 (2d Cir. 1992). However, it is "not bound to

accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S.

265, 286 (1986). Moreover, "[t]hreadbare recitals of the elements of a cause of action supported

by conclusory statements" do not constitute sufficient factual allegations. *See Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009). "To survive a motion to dismiss, a complaint must contain sufficient

12

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.*
(quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A complaint states a claim that is facially plausible when the factual content pleaded
therein is sufficient to "allow[] the court to draw the reasonable inference that the defendant is
liable for the misconduct alleged." *Id.* (internal citation omitted). "The plausibility standard is
not akin to a probability requirement, but it asks for more than a sheer possibility that a
defendant has acted unlawfully." *Id.* (internal quotation marks omitted) (quoting *Twombly*, 550
U.S. at 557). "Plausibility thus depends on a host of considerations: the full factual picture
presented by the complaint, the particular cause of action and its elements, and the existence of
alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L–7
Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011) (citing *Iqbal*, 556 U.S. at 547–
82). Accordingly, courts are "not required to draw unreasonable inferences or to credit legal
conclusion at odds with the plaintiff's own factual allegations." *BLT Rest. Grp. LLC v.
Tourondel*, 855 F. Supp. 2d 4, 15 (S.D.N.Y. 2012) (quoting *Solow v. Stone*, 994 F. Supp. 173,
181 (S.D.N.Y. 1998)).

## DISCUSSION

### A.      Rule 12(b)(1) - Article III Standing

*1.   Injury-in-Fact Requirements*

In order to maintain a case, the plaintiff is required to "allege[] such a personal stake in
the outcome of the controversy as to warrant his invocation of federal-court jurisdiction."
*Summers v. Earth Island Institute*, 555 U.S. 488, 493 (2009) (citing *Warth v. Seldin*, 422 U.S.
490, 498-499 (1975)). To establish constitutional standing, the plaintiff must: (1) "have suffered
an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3)

13

that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1547 (2016) (citing *Lujan,* 504 U.S. at 560-61 (1992)). Moreover, it "must be 'likely,' as opposed to merely 'speculative' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561.

Regarding the first element, "[t]o establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 136 S.Ct. at 1548 (citing *Lujan*, 504 U.S. at 560). For an injury to be "particularized" it must "affect the plaintiff in a personal and individual way." *Id*. For an injury to be "'concrete' it must actually exist." *Id*. (citing Black's Law Dictionary 479 (9th ed. 2009)). "Any monetary loss suffered by the plaintiff satisfies [the injury element]; 'even a small financial loss.'" *Carter v. HealthPort Technologies, LLC*, 822 F.3d 47, 55 (2d Cir. 2016). However, the injury must be to a legally protected interest of the plaintiff, and not of a third party. *Warth*, 422 U.S. at 499.

Because standing is not merely a "pleading requirement but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at [each] successive stage[] of litigation." *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1276 (2015) (quoting *Lujan*, 504 U.S. at 561). As a result, "the showing that must be made in order to withstand a dismissal for lack of standing increases as the suit proceeds." *Carter*, 822 F.3d at 55 (quoting *Lujan*, 504 U.S. at 561). For example, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presume that general allegations embrace those specific

14

facts that are necessary to support the claim.'"  *Lujan*, 504 U.S. at 561 (citing *Lujan v. National Wildlife Federation*, 497 U.S. 871, 889 (1990)).

   2. *Rosen's Alleged Injury*

   The Trustee contends Rosen has failed to allege an injury in fact that he has personally suffered as required to establish a "case or controversy" and therefore lacks standing to prosecute this Adversary Proceeding.  In support of this contention, the Trustee argues that, pursuant to New York state law, once funds are deposited in a bank account, the account holder is presumed to have title to those funds.  It is undisputed that the Wired Funds were transferred from a bank account owned by Orion Levi, Am. Compl. ¶16, and not Plaintiff Rosen.  Hence, the Trustee asserts that the Amended Complaint does not allege injury to property in which Rosen owns an interest and therefore Rosen cannot establish an actual, personal injury in fact sufficient to establish his constitutional standing.

   Rosen argues that the Trustee's argument fails for two reasons.  First, he contends that there is no inherent inconsistency in the allegation that Rosen owned funds in an account under Orion Levin's name, and, on a motion to dismiss, the Court is required to accept as true Rosen's factual allegations relating to standing.  Next, Rosen urges that the Supplemental Declarations establish that while the Account is maintained under Levin's name, Rosen and Levin have mutual ownership of the funds in the Bank Account, thereby rebutting the New York state law presumption of ownership.

   This Court finds that Rosen has meet his burden in alleging facts that affirmatively and plausibly suggest that he suffered a concrete injury sufficient to satisfy the injury-in-fact requirement of Article III standing.

As a general rule, New York law presumes that "once funds are deposited in a bank account, the account holder has title to and control over those funds." *LFD Operating, Inc. v. Ames Dep't Stores, Inc.* (*In re Ames Dept. Stores, Inc.*), 274 B.R. 600, 617 (Bankr. S.D.N.Y. 2002); *see also Capital One Equipment Finance Corp., dba Capital One Taxi Medallion Finance v. Singh* (*In re Singh*), 585 B.R. 330, 338 (Bankr. E.D.N.Y. 2018) (citing *McHale v. Boulder Capital LLC* (*In re 1031 Tax Group, LLC*), 439 B.R. 47, 70-71 (Bankr. S.D.N.Y. 2010). However, this presumption of ownership "may be rebutted by evidence that another person actually owns the property, either by showing that he effectively exercises control over the property or that the ostensible owner holds the property for his benefit." *In re Suntech Power Holdings Co.*, 520 B.R. 399, 411 (Bankr. S.D.N.Y. 2014) (citing *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 86 (2d Cir. 2002)).

In his Amended Complaint, Rosen described his relationship to the funds only by the short statement that "[t]he Wired Funds are the property of Rosen." Am. Compl. ¶ 35. While this claim is called into question by the additional fact plead in Amended Complaint that the funds came from his wife's bank account, Am. Compl. ¶ 16, at the pleadings stage, "the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." *Natural Res. Def. Council v. Johnson*, 461 F.3d 164, 171 (2d Cir.2006); *see also Duff & Phelps, LLC v. Vitro S.A.B. de C.V.,* 18 F. Supp. 3d 375, 382 (S.D.N.Y. 2014). Further, for the purposes of a Rule 12(b)(1) or 12(h)(3) analysis in resolving a motion to dismiss for lack of subject matter jurisdiction, the Court may reference the Supplemental Declarations submitted by Rosen and his wife. *See Makarova*, 201 F.3d at 113 (observing that in resolving a motion to dismiss for lack of subject matter jurisdiction, court may refer to evidence outside the pleadings). The Court finds that the Supplemental Declarations and the exhibits annexed thereto demonstrate

16

that Rosen held a cognizable interest in the Wired Funds sufficient to establish Article III

standing.

While "a bare assertion of ownership of the *res* without more is inadequate to prove an

ownership interest sufficient to establish standing," *Olivo v. U.S.*, 1997 WL 23181, at *7

(S.D.N.Y. Jan. 22, 1997) (quoting *United States v. $38,570 in U.S. Currency*, 950 F.2d 1108,

1112 (5th Cir. 1992)), a party can rebut the New York presumption against ownership by

proving a "possessory or ownership interest by actual possession, dominion, control, title, or

financial stake" of the account funds.  *United States v. $79,000 in Account No. 2168050/6749900*

*at Bank of New York,* 1996 WL 648934, at *3 (S.D.N.Y. Nov. 7, 1996); *see also U.S. v. One*

*1982 Porsche 928*, 732 F. Supp. 447, 451 (S.D.N.Y. 1990).  According to Black's Law

Dictionary, "control" means "[t]he direct or indirect power to govern the management and

policies of a person or entity, whether through ownership of voting securities, by contract, or

otherwise; the power or authority to manage, direct, or oversee."  Black's Law Dictionary (10th

ed. 2014).  "Dominion" is defined as "[c]ontrol; possession."  *Id.*

Rosen has alleged facts that amply demonstrate dominion and control over the funds.

Through exhibits attached to the Supplemental Declarations, Rosen establishes that he has power

of attorney over the Bank Account that authorizes him to execute all transactions.  Heerde Decl.

Exh. A; Levin Decl. Exh. A.  He regularly deposits funds into the Bank Account from art sales

and makes withdraws for purchases.  Rosen Decl. ¶ 8; Levin Decl. ¶ 9.  Further, both Rosen and

his wife have an understanding that the funds held in the Bank Account are intended to

ultimately benefit their family and, notwithstanding the title of the account holder, both Rosen

and Levin consider all of the funds held in the Bank Account to be joint property.  Rosen Decl. ¶

7; Levin Decl. ¶ 8.

These alleged facts undoubtedly elevate Rosen's interest in the funds beyond "bare assertions of ownership." *Cf $79,000 in Account No. 2168050/6749900,* 1996 WL 648934, at *4 (Claimant could not show dominion and control over account where they failed to allege that they "had any signatory authority over the . . . account, any security interest in the account, or any power to direct the disposition of funds in the . . . account"). Moreover, although Rosen did argue that the Court should treat him and his wife as "one economic unit" for purposes of evaluating standing, First Hearing Tr. 42-43:24-1, Rosen's standing is not predicated solely on his spousal relationship with the account holder. *Cf. United States v. All Funds on Deposit at Citigroup Smith Barney Account No. 600-00338,* 617 F. Supp. 2d 103, 118 (E.D.N.Y. 2007) ("The mere fact that an individual is related to a property owner in no way conveys the type of ownership or possessory interest that is sufficient to establish standing."). Nor does he rely solely on his power-of-attorney authority over the account. *See Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 17-18 (2d Cir. 1997) ("Standing alone, a power of attorney does not enable the grantee to bring suit in his own name.").

Rather, it is the cumulative assertions contained in the Supplemental Declarations that demonstrate that Rosen "effectively exercises control over the property." *In re Suntech*, 520 B.R. at 411. Rosen routinely withdraws and deposits money into the account, communicates with the bank regarding the account, and manages it based on a mutual understanding with his wife that the funds are jointly owned. Rosen Decl. ¶ 7-8; Levin Decl. ¶ 8-9. *See id.* (debtor was able to rebut New York presumption against ownership by showing that it "had complete and unfettered control over the funds" and where the parties' "conduct confirmed their understanding" that the debtor maintained ownership of the funds); *cf United States v. $541,395.06 U.S. Currency*, 2012 WL 3614294, at *4 (W.D.N.Y. Aug. 21, 2012) (claimant

18

could not prove dominion over deposited funds where they "failed to show a mutual agreement with M & T Bank that the claimant would retain ownership of the deposited funds").

Other cases have found facts similar to those alleged by Rosen to be sufficient to rebut the New York presumption regarding ownership of bank account funds. For example, in *United States v. Contents of Account Numbers 208-06070 & 208-06068-1-2,* 847 F. Supp. 329 (S.D.N.Y. 1994), two accounts were, as here, held only in the name of the plaintiff's wife name. Defendants moved for summary judgment on the ground that the plaintiff did not have any interest in the accounts and therefore lacked standing. The court ruled that the plaintiff's sworn statement was enough to defeat summary judgment where he alleged that he and his wife "permitted the other access to the other's individual accounts. As husband and wife, they shared jointly in their property holdings. He had authority to sign his wife's name and make withdrawals or deposits as the need arose." *Id.* at 333. *See also All Funds on Deposit at Citigroup Smith Barney Account*, 617 F. Supp. 2d at 117-18 (finding that, while claimant "clearly. . . has no ownership interest in the Defendant Accounts," she might nonetheless be entitled to standing, where she stated that she "had involvement with and directed activity in one of the accounts, including but not limited to, that [she] had and exercised the right to use funds from the account, both for [her] benefit and [her] three minor children's benefit").

In sum, Rosen exerts sufficient control over the Bank Account to demonstrate an interest in the funds within, rebutting the presumption that only the account holder has title to and control over the funds. Rosen's purported injury is also clearly traceable to Chowaiki's conduct and would likely be redressed by a favorable decision that compensated Rosen for his losses, satisfying the second and third prongs of the standing analysis. As such, Rosen has met his burden of establishing Article III standing to pursue his claims against Chowaiki.

**B.      Rule 12(b)(6) - Failure to State a Claim**

     1.      *Count I - Fraudulent Inducement*

Pursuant to Count I of the Amended Complaint, Rosen seeks a declaratory judgment that he was fraudulently induced to enter into a transaction pursuant to which he transferred the Wired Funds to the Debtor and that he has been injured by the Debtor's alleged fraud in at least the amount of the Wired Funds.  Am. Compl. ¶ 37-43.

In order to state a claim for intentional or fraudulent misrepresentation in New York, a plaintiff must allege: (1) a misrepresentation or a material omission of fact, (2) which was false and known to be false by the defendant, and (3) made for the purpose of inducing the other party to rely upon it, (4) justifiable reliance of the other party on the misrepresentation or material omission, and (5) injury.  *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 178, 944 N.E.2d 1104 (N.Y. 2011).

Fraudulent inducement claims are subject to the heightened pleading standard of Rule 9(b), which is made applicable in this proceeding by Bankruptcy Rule 7009.  "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed .R. Civ. P. 9(b).  "[T]he requisite intent of the alleged speaker of the fraud need not be alleged with great specificity," *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir.1996), because "'a plaintiff realistically cannot be expected to plead a defendant's actual state of mind.'"  *Id.* (quoting *Conn. Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir. 1987)).  At the pleadings stage, the alleged fraud need only be plausible based on the complaint; it need not be more likely than other possibilities.  *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 174 (2d Cir. 2015); *see Twombly*, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed

20

even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery

is very remote and unlikely.").

The fraud alleged by Rosen is fraudulent inducement to enter into a contract.  Such a

claim "arises from a promisor's successful attempts to induce a promisee to enter into a

contractual relationship despite the fact that the promisor harbored an undisclosed intention not

to perform under the contract."  *Barrie House Coffee Co. v. Teampac, LLC*, 2016 WL 3645199,

at *7 (S.D.N.Y. June 30, 2016) (citing *Neckles Builders, Inc. v. Turner*, 117 A.D.3d 923, 925,

986 N.Y.S. 494, 497 (2d Dep't 2014)).  "There is no doubt that a misrepresented intention to

perform a contract may constitute actionable fraud."  *Neckles Builders*, 117 A.D.3d at 925

(internal citation omitted).  Although predictions typically cannot be fraudulent, a "relatively

concrete representation as to . . . future performance, if made at a time when the speaker knows

that the represented level of performance cannot be achieved, may ground a claim of fraud."

*Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994).

Here, Rosen alleges with specificity that Chowaiki sent emails to him and spoke on the

phone with him, provides that dates of communications, and quotes the specific statements

purportedly made by Chowaiki on behalf of the Debtor.  Am. Compl. ¶ 12-15.  In certain

instances, Rosen attaches to the Amended Complaint the emails on which he bases his claim.

*See id*. Exh. A.  He further alleges that, unbeknownst to Rosen, at the time Chowaiki was

negotiating the transaction with Rosen, Chowaiki had already entered into a finalized agreement

regarding the identical artwork with someone else, evidencing Chowaiki's intent not to perform

under the agreement with Rosen.  *Id.* ¶ 21-25; *id*. Exh. C.  Rosen further alleges that after

transferring the Wired Funds to the Debtor, he never heard from Chowaiaki again.  *Id.* ¶ 17.

The Court concludes that these allegations meet the heightened pleading requirement of Rule

9(b).  *See U.S. ex rel. Kester v. Novartis Pharm. Corp.,* 23 F. Supp. 3d 242, 252 (S.D.N.Y.

2014) ("Rule 9(b) requires that a plaintiff set forth the who, what, when, where and how of the

alleged fraud.") (quoting *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 125 F.3d

899, 903 (5th Cir.1997));

    The Court also concludes that the allegations in the Amended Complaint are sufficient to

state a fraud claim that is facially plausible.  In *Neckles Builders*, the Appellate Division held that

similar facts constituted sufficient allegations to state a claim sounding in fraud.  117 A.D.3d at

926.  In *Neckles Builders*, the plaintiff pled that the defendants made a promise to give the

plaintiff an equity stake in a venture if the plaintiff agreed to forego its normal fees and

compensation for the subject work, and that the defendants made that promise while harboring

an undisclosed intention never to give the plaintiff such an equity stake.  *Id*.  The Appellate

Division denied the defendant's motion to dismiss at the pleadings stage based on these

allegations.  *Id.*

    Although the Court is inclined to find that Rosen pleads sufficient facts to support a claim

sounding in fraud, the form of relief sought by Rosen (*i.e.* a declaratory judgment finding the

factual elements of fraud, seemingly as a basis for the imposition of a constructive trust sought in

Count III) compels the Court to dismiss the claim as it is presently pled.

    Under the Declaratory Judgment Act, federal courts have the discretionary authority to

grant declaratory relief.  *See* § 28 U.S.C. 2201(a) ("[A]ny court of the United States, upon the

filing of an appropriate pleading, may declare the rights and other legal relations of any

interested party seeking such declaration, whether or not further relief is or could be sought.").

But that authority is discretionary, and a declaratory judgment must serve a purpose.  *See Koch v.*

*Rodenstock*, 2012 WL 5844187, at *12 (S.D.N.Y. May 9, 2012); *see also James v. Alderton*

*Dock Yards*, 256 N.Y. 298, 305, 176 N.E. 401 (N.Y. 1931) (Cardozo, J.) ("The use of a declaratory judgment, while discretionary with the court, is nevertheless dependent upon facts and circumstances rendering it useful and necessary . . . .  It is usually unnecessary where a full and adequate remedy is already provided by another well-known form of action.").

It is not clear what purpose a declaratory ruling would serve in this case.  A mere finding by the Court of the underlying facts of fraud, with nothing more, would not alter the legal relationship between the parties.  *See Koch,* 2012 WL 5844187, at *13 (denying declaratory relief where the "Plaintiff is merely asking the Court to 'declare' the substance of his fraud allegation."); s*ee also* Restatement (Second) of Judgments § 33 (1982) ("The court should lean toward declining the action if another remedy, such as a coercive action on an existing claim, is plainly available and would have wider res judicata effects.").

Here, a finding of the factual elements of fraud would not facilitate Rosen's separate claim for the imposition of a constructive trust, since the two claims are distinct and require separate legal and factual considerations.  *See In re First Cent. Fin. Corp.,* 377 F.3d 209, 216 (2d Cir. 2004).  Rosen's Amended Complaint acknowledges as much, as it separately lays out the distinct elements of pleading fraud and the imposition of a constructive trust, in Counts I and III, respectively.

The Court therefore declines to proceed with Rosen's Count I claim seeking a declaratory judgment, where Rosen has other available remedies, including an affirmative action for fraud or conceivably a nondischargeability action under 523(a).  *See* Restatement (Second) of Judgments § 33 (1982) ("A litigant's seeking a declaratory remedy when he could have maintained a conventional action for coercive relief often signifies that he is in a quandary not only as to what his rights and duties are, but also as to how to secure their adjudication."); *see also Walsh v.*

*Andorn*, 33 N.Y.2d 503, 507, 311 N.E.2d 476 (N.Y. 1974) ("Where there is no necessity for

resorting to the declaratory judgment[,] it should not be employed."); *Apple Records, Inc. v.*

*Capitol Records, Inc.*, 137 A.D.2d 50, 53, 529 N.Y.S.2d 279, 281 (1st Dep't 1988) ("A cause of

action for a declaratory judgment is unnecessary and inappropriate where the plaintiff has an

adequate, alternative remedy in another form of action.") (citations omitted).[8]


      2.     *Count II - Section 541(d) of the Bankruptcy Code*

Pursuant to Count II of the Amended Complaint, Rosen seeks a declaratory judgment

under section 541(d) of the Bankruptcy Code that the Debtor does not hold any equitable or

ownership interest in the Wired Funds because they were obtained as the result of the alleged

fraud perpetrated by Chowaiki.  Am. Compl. ¶ 44-48.

Section 541(a)(1) of the Bankruptcy Code defines "property of the estate" as including

"all legal or equitable interests of the debtor in property as of the commencement of the case." 11

U.S.C. § 541(a)(1).  Section 541(d) provides:

> (d) Property in which the debtor holds, as of the commencement of
> the case, only legal title and not an equitable interest . . . becomes
> property of the estate under subsection (a)(1) or (2) of this section
> only to the extent of the debtor's legal title to such property, but not
> to the extent of any equitable interest in such property that the debtor
> does not hold.

The Court finds that Count II similarly seeks futile and unnecessary declaratory relief,

especially in light of Count III, which seeks the imposition of a constructive trust.  At best, a

---

[8] Even if a declaratory judgment here would in some way facilitate a future action, the Court declines to entertain
piecemeal litigation when a future global resolution would otherwise be possible.  *See Elec. Data Sys. Corp. v.*
*Xerox Corp.*, 273 A.D.2d 28, 29, 709 N.Y.S.2d 46, 47 (1st Dep't 2000) ("A declaration should not be made where it
results in trying a controversy piecemeal"); *Smith v. W.U. Tel. Co.*, 276 A.D. 210, 213, 93 N.Y.S.2d 653 (1st Dep't
1949) ("A declaratory judgment should not be granted where the action serves to increase rather than to decrease
litigation or where it results in trying a controversy piecemeal.").

declaratory judgment under Section 541(d) would merely declare that certain property held by the debtor is not part of the estate, rendering it "*subject* to a duty to reconvey it to the rightful owner." *In re Fetman,* 567 B.R. 702, 705 (Bankr. E.D.N.Y. 2017) (emphasis added). But until a constructive trust is affirmatively impressed, both the legal and equitable interests in property are held by the debtor. *See In re Omegas Grp., Inc.,* 16 F.3d 1443, 1448 (6th Cir. 1994) ("Nowhere in the Bankruptcy Code does it say, 'property held by the debtor subject to a constructive trust is excluded from the debtor's estate.'"). Therefore, a declaratory ruling under § 541(d), by itself, would not impart any equitable interest in the Wired Funds to Rosen. *See Kinney v. Gallagher*, 524 B.R. 455, 463 (W.D.N.Y. 2015) ("[W]ith no court order imposing a constructive trust, the Lake Road property was wholly property of Gallagher's estate under Bankruptcy Code Section 541."); *Taub v. Taub (In re Taub),* 427 B.R. 208, 220 (Bankr. E.D.N.Y.2010) ("Until the state court or this court issues an order [imposing a constructive trust], the [properties subject to a constructive trust action] are ... property of the Debtor's estate under Bankruptcy Code Section 541"). The Court finds Count II without purpose and, ultimately, redundant of the relief sought under Count III.

### 3.      *Count III - Imposition of a Constructive Trust*

Pursuant to Count III of the Amended Complaint, Rosen seeks the imposition of a constructive trust and the immediate turnover of the Wired Funds. Am. Compl. ¶ 49-53.

Under New York law, a constructive trust is an equitable remedy, the key purpose of which is to prevent unjust enrichment. *See In re Koreag Controle et Revision S.A*, 961 F.2d 341, 354 (2d. Cir. 1992); *Simonds v. Simonds*, 45 N.Y.2d 233, 242, 380 N.E.2d 189 (N. Y. 1978). A party seeking the imposition of a constructive trust generally must establish that there is "clear

25

and convincing evidence of: (1) a confidential or fiduciary relationship; (2) an express or implied

promise; (3) a transfer in reliance on such a promise; and (4) unjust enrichment." *Atateks*

*Foreign Trade Ltd. v. Dente*, 798 F. Supp. 2d 506, 507 (S.D.N.Y. 2011).

The Court finds that the Amended Complaint, read in a light most favorable to Rosen,

does not sufficiently plead facts to support a finding of unjust enrichment, which is the predicate

injury for the remedy of a constructive trust.

As an initial matter, the Court notes that the Amended Complaint incorrectly frames the

cause of action underlying Count III as "the imposition of a constructive trust." Am. Compl. ¶

49-53. A constructive trust is a remedy, not a cause of action. The proper pleading would be a

claim for unjust enrichment, with the requested relief of a constructive trust. *See Amusement*

*Indus., Inc. v. Stern,* 693 F. Supp. 2d 327, 357 (S.D.N.Y. 2010) ("[A constructive trust] is not an

independent cause of action but a device by which property may be recovered if the person

holding the property was unjustly enriched.").

Here, Rosen's true claim is for fraudulent inducement, a common law tort pled

(incorrectly as a claim for declaratory judgment, as discussed above) in Count I of the Amended

Complaint. A claim for unjust enrichment is inappropriate where an overlapping common law

claim is available to the plaintiff. *See Benham v. eCommission Sols*., *LLC*, 118 A.D.3d 605, 607,

989 N.Y.S.2d 20 (N.Y. 2014); *Corsello v. Verizon New York, Inc.,* 18 N.Y.3d 777, 791, 967

N.E.2d 1177 (N.Y. 2012) ("An unjust enrichment claim is not available where it simply

duplicates, or replaces, a conventional contract or tort claim."). In such cases, the plaintiff's

remedies are limited to those provided under the common law claim, to the exclusion of those

remedies that flow from unjust enrichment. *See id.* ("Plaintiffs allege that [defendant] committed

actionable wrongs . . . by deceiving them into thinking they were not entitled to compensation.

To the extent that these claims succeed, the unjust enrichment claim is duplicative; if plaintiffs' other claims are defective, an unjust enrichment claim cannot remedy the defects."); *see also Samiento v. World Yacht Inc.,* 10 N.Y.3d 70, 81, 883 N.E.2d 990 (N.Y. 2008).

Nonetheless, the Court will proceed with its constructive trust analysis, since the factual allegations supporting Count III are identical to those supporting Count I; therefore a successful claim in Count I could, at least in theory, support an equitable remedy in the form of a constructive trust. *See Comcast of Illinois X, LLC*, 2004 WL 1718522, at *8 ("Although a constructive trust claim is superfluous, a plaintiff still has the option to prove that a constructive trust is an appropriate equitable remedy if it prevails on other claims.").

A claim for unjust enrichment and a remedy of a constructive trust is applicable "only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." *Corsello,* 18 N.Y.3d at 790–91. The guiding purpose of a constructive trust, as an equitable remedy, is to correct such instances of unjust enrichment that would not otherwise be redressable under common law actions. *See Corsello,* 18 N.Y.3d at 790–91, 967 ("Unjust enrichment is not a catchall cause of action to be used when others fail."); *Boyle v. Kelley*, 42 N.Y.2d 88, 91, 365 N.E.2d 866 (N.Y. 1977) ("[E]quity will not entertain jurisdiction where there is an adequate remedy at law.").

Unjust enrichment exists where "the acts of the parties or others have placed in the possession of [the defendant] money, or its equivalent, under such circumstances that in equity and good conscience he ought not to retain it." *Miller v. Schloss,* 218 N.Y. 400, 407, 113 N.E. 337 (N.Y. 1916). *See In re First Cent. Fin. Corp.*, 377 F.3d at 213; *see also Marini v. Adamo,* 12 F. Supp. 3d 549, 552 (E.D.N.Y. 2014), *aff'd,* 644 F. App'x 33 (2d Cir. 2016) ("To prevail on a

claim for unjust enrichment in New York, a plaintiff must establish: (1) defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances were such that equity and good conscience require defendant[ ] to make restitution.") (internal quotation marks and citations omitted).

While a finding of fraud can be grounds for the imposition of a constructive trust outside of bankruptcy, *see, e.g., S.E.C. v. Credit Bancorp, Ltd.,* 290 F.3d 80, 88 (2d Cir. 2002), "bankruptcy courts are generally reluctant to impose constructive trusts without a substantial reason to do so." *In re First Cent. Fin. Corp*., 377 F.3d at 217.  In the context of bankruptcy, where – as seems to be the case here – liabilities generally outweigh assets, a court must consider the equities of all creditors in determining whether there was unjust enrichment.  *Id*. at 218 ("A constructive trust is fundamentally at odds with the general goals of the Bankruptcy Code.") (quoting *In re Omegas Grp.,* 16 F.3d at 1451).

Here, there is no unjust enrichment because the estate is not "unjustly" enriched.  *In re Dreier LLP*, 429 B.R. 112, 137 (Bankr. S.D.N.Y. 2010) ("Although the trustee's recovery of the disputed property enriches the bankrupt estate, the estate is not 'unjustly' enriched.").  Defendant Chowaiki may have personally benefited from his fraudulent activities, at least in the short term, but Rosen does not allege that the Debtor Gallery was unjustly enriched by Chowaiki's scheme. More significantly, even to the extent that the Gallery may have been enriched prior to bankruptcy, the gravitational center of the equities analysis focuses on the totality of the Debtor's creditors once bankruptcy was initiated.  *See In re First Cent. Fin. Corp.,* 377 at 218 ("[W]e believe it important to carefully note the difference between constructive trust claims arising in bankruptcy as opposed to those that do not, as the equities of bankruptcy are not the equities of the common law.") (citations and quotation marks omitted*); In re Vichele Tops, Inc.*, 62 B.R.

28

788, 792 (Bankr. E.D.N.Y. 1986) ("While courts, in nonbankruptcy matters, consider primarily

the interests of the parties before it, a court of bankruptcy has a broader scope. It must interpret

its enabling legislation in the light of its purpose.") (internal quotation marks and citations

omitted).

In the chapter 7 context, where the Debtor's assets are essentially confiscated and

converted into property of the bankruptcy estate, and where the Trustee is governed by equitable

obligations to apportion the estate so that all "unsecured creditors receive fair but not full

returns," *In re First Cent. Fin. Corp.,* 377 F.3d at 218, the Trustee simply cannot be said to hold

property "under such circumstances that in equity and good conscience he ought not to retain it."

*Id.* (quoting *Simonds*, 45 N.Y.2d at 242); *see In re Commodore Bus. Machs., Inc.*, 180 B.R. 72,

83 (Bankr. S.D.N.Y. 1995) ("[C]onstructive trusts are anathema to the equities of bankruptcy

since they take from the estate, and thus directly from competing creditors, and not from the

offending debtor.") (quoting *In re Omegas Grp.,* 16 F.3d at 1452).

The very purpose of bankruptcy is to protect the interests of all creditors from the actions

of individual creditors, to "eliminate[ ] strategic costs that would otherwise be associated with a

race to the courthouse."  Thomas H. Jackson, *Bankruptcy, Non-Bankruptcy Entitlements, and the

Creditors' Bargain*, 91 YALE L.J. 857, 862 (1982); *see also Young v. Higbee Co.,* 324 U.S. 204,

210 (1945) ("[T]o protect the creditors from one another").  No equities would be served here by

allowing Plaintiff to satisfy his losses while similarly situated creditors, many of whom hold

similar causes of action against the Debtor for fraud and fraudulent inducement, wait for *pro rata*

distribution.  *See In re Ades & Berg Grp. Inv'rs*, 550 F.3d 240, 244 (2d Cir. 2008) ("There is no

inequity in treating [creditor] in the same manner as any other depositor/creditor who was

unfortunate enough to have placed its money' with the [debtor]."); *In re Flanagan,* 503 F.3d 171,

29

182 (2d Cir. 2007) ("This type of privileging of one unsecured claim over another clearly thwarts the principle of ratable distribution underlying the Bankruptcy Code.").

Rosen's pleadings do not demonstrate a "substantial reason" for the Court to allow him to remove the Wired Funds from the bankruptcy estate, at the expense of other creditors. *In re First Cent. Fin. Corp.,* 377 F.3d at 218; *see Miller v. Hartford Life Ins. Co.,* 64 F. App'x 795, 797 (2d Cir. 2003) ("[U]nder New York law, one who seeks to impose a constructive trust must establish the facts giving rise to that remedy by clear and convincing evidence."). As alleged by Rosen himself, Chowaiki defrauded many others. *See* Am. Compl. ¶¶ 19-20, 21-32. Indeed, Chowaiki pled guilty in the Criminal Case for having "devised a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses . . ." involving at least twenty-five pieces of art, and with proceeds traceable to the commission of the offense in the amount of at least $16,635,370. Criminal Case, Docket No. 15. Shortly after filing for bankruptcy, the Debtor Gallery's schedules listed liabilities of $11,877,011.03 and assets of $276,681.59. Case No. 17-13228, ECF No 7; *see* Motion to Dismiss ¶ 6. The Trustee further reports that upon taking control of the estate, it came into the possession of between 150-200 pieces of art many of which are claimed by third-parties. First Hearing 17:2-10. To impose a constructive trust on the estate would only serve to prejudice the other creditors in this case. *See In re Dreier LLP*, 2016 WL 3920358, at *7 (S.D.N.Y. July 15, 2016), *aff'd*, 683 F. App'x 78 (2d Cir. 2017*)* ("Equity is not served by disadvantaging one set of victims in order to restore another, where the only source of assets is a limited common pool."); *In re Dreier LLP,* 429 B.R. at 134 ("The right of a Ponzi scheme victim to . . . gain priority over other victims, is severely limited.") (citing *SEC v. Credit Bancorp*, 290 F.3d at 88-89).[9]

---

[9] Rosen points to the allegation in his Amended Complaint that the Wired Funds remain intact and traceable in the Debtor's bank account in support of his request for the imposition of a constructive trust. Am. Compl. ¶ 33-35.

Rosen may, of course, file a proof of claim in the bankruptcy, and stand to be treated in the same *pro rata* manner as the Debtor's other creditors. However, he has not stated a claim that is plausible on its face to show unjust enrichment and is therefore not entitled to the imposition of a constructive trust. As such, Count III fails to state a claim for which relief can be granted.

Furthermore, while the absence of unjust enrichment, standing alone, is fatal to a request for a constructive trust, Rosen also does not plead a facially plausible fiduciary relationship with Chowaiki or any other relationship of trust that might warrant the imposition of a constructive trust. Rosen asserts in his Amended Complaint that the Gallery owed a fiduciary duty to him "by virtue of his status as a partner" in a purported joint venture centered around the purchase and resale of the Kandinsky.[10]   Am. Compl. ¶ 51. The Court finds, based on the alleged facts, that

---

While it is true that a claimant of funds held in trust or in escrow bears the burden of tracing these funds "to the specific property at issue." *In re Schick*, 234 B.R. 337, 344 (Bankr. S.D.N.Y. 1999), Rosen's assertions here belie his overall argument that a constructive trust is appropriate. This is because Chowaiki did not hold the Wired Funds "in trust" at any time prior to bankruptcy. "Congress plainly excluded [from the property of the debtor within the meaning of Section 541] property of others held by the debtor in trust at the time of the filing of the petition." *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 (1983). But "in trust" in that context refers to situations of segregated escrow accounts, or other types of bailment relationships that involve fiduciary obligations. *See In re Dreier LLP*, 527 B.R. at 138 ("[E]scrow funds present a distinct situation, because the property at issue is held in trust and, therefore, the escrow agent has no legal or equitable interest in that property. With respect to [debtor / defendant's] other "client" victims, such as Gardi, no valid trust or escrow account existed . . . [because defendant] simply stole the funds at issue without Gardi's knowledge.").

Here, where there are merely allegations of an arms-length business transaction gone bad, Chowaiki was fully entitled to comingle the Wired Funds with his own funds, and therefore no "trust" existed. *See In re Black & Geddes, Inc.*, 35 B.R. 830, 836 (Bankr. S.D.N.Y.1984) ("It is a firmly established principle that if a recipient of funds is not prohibited from using them as his own and commingling them with his own monies, a debtor-creditor, not a trust, relationship exists."). While the Court can retroactively determine that a constructive trust had materialized prior to bankruptcy as a consequence of a subsequent finding of unjust enrichment, *see* 5 Austin W. Scott & William F. Fratcher, The Law of Trusts § 462.4 (4th ed. 1987) ("The word 'constructive' is derived from the verb 'construe,' not from the verb 'construct.' … the court construes the circumstances in the sense that it explains or interprets them; it does not construct them."), as previously discussed, the Court ultimately concludes that there is no unjust enrichment.

[10] Rosen asserted an alternative argument for the first time in his Opposition to the Trustee's Motion to Dismiss, [ECF No. 14], alleging that even if the Court finds there is no joint venture between the parties, a fiduciary relationship nevertheless arose between Rosen and Chowaiki based, *inter alia*, on Chowaiki holding himself out as an expert in Kandinsky paintings. This coupled with Chowaiki's other actions and his exploitation of Rosen's long-standing friendship with Barberi, allegedly fostered a relationship of trust between the two upon which Rosen relied. However, the Court declines to sustain a claim of a fiduciary relationship on this basis since it is predicated on facts

the transaction involving the Kandinsky was an arms-length commercial transaction and not a joint venture. The relationship between Rosen and Chowaiki therefore did not give rise to any obligations "stricter than the morals of the market place," *Meinhard v. Salmon*, 164 N.E. 545, 249 N.Y. 458 (N.Y. 1928) and would be unlikely to entitle Rosen to a remedy of a constructive trust, even if the equities were weighed in a non-bankruptcy context. *See Faulkner v. Arista Records LLC*, 602 F. Supp. 2d 470, 482 (S.D.N.Y. 2009) ("Generally, an arm's length business transaction, even those where one party has superior bargaining power, is not enough to give rise to a fiduciary relationship.") (quoting *Sony Music Entertainment, Inc. v. Robison, et al.,* 2002 WL 272406, at *3 (S.D.N.Y. Feb. 26, 2002)).

The constructive trust doctrine is not "rigidly limited," *Simonds,* 45 N.Y.2d at 241, 380 N.E.2d at 194, and the absence of any one factor in the analysis "will not itself defeat the imposition of a constructive trust when otherwise required by equity." *In re Koreag, Controle et Revision S.A.*, 961 F.2d at 353. However, the character of the relationship between plaintiff and defendant is informative in determining whether inequitable unjust enrichment has occurred. *See id.* at 353-54 (the heart of the issue is whether the "person wrongfully acquiring property can be treated as a constructive trustee notwithstanding the lack of a fiduciary relationship.").

For this reason, many cases in this circuit have ruled that a failure to plead a confidential relationship precludes a constructive trust remedy as a matter of law, even after acknowledging that this element is not a *sine qua non* of a constructive trust. *See, e.g, Atateks Foreign Trade Ltd. v. Dente*, 798 F. Supp. 2d 506, 507-08 (S.D.N.Y. 2011); *Faulkner v. Arista Records LLC*, 602 F. Supp. 2d 470 (S.D.N.Y. 2009); *DLJ* Mortg. *Capital, Inc. v. Kontogiannis*, 2009 WL

---

outside the scope of what is alleged in the Complaint. *Goodman v. Port Authority of N.Y.& N.J.*, 850 F. Supp. 2d 363, 384 n.3 (S.D.N.Y. 2012) ("In so far as Plaintiff and Port Authority assert new factual allegations, they are not considered.") (citing *Adler v. Aztech Chas P. Young Co.* 807 F. Supp. 1068, 1072 (S.D.N.Y. 1992)).

1652253 (E.D.N.Y. June 4, 2009).  Even in *In re Koreag, Controle et Revision S.A.*, the case

most often cited in New York for the proposition that the absence of a confidential or fiduciary

relationship does not "automatically defeat [a] claim of constructive trust," the court nevertheless

concluded that "[c]learly, [defendant] was acting in *some* fiduciary capacity towards *some*

entities at the time it received the Disputed Funds."  961 F.2d at 354 (emphasis in original).

Participation in a joint venture will create fiduciary obligations to other members of the

joint venture.  *Northern Shipping Funds I, LLC v. Icon Capital Corp.*, 921 F. Supp. 2d 94, 102

(S.D.N.Y. 2013).  However, without analyzing each of the elements of a joint venture, it is clear

to the Court that Rosen has not pled any degree of co-management or control over the

transaction, which is an indispensible element of a joint venture.  This is fatal to Rosen's claim

of a joint venture with Chowaiki.  *See Cosy Goose Hellas v. Cosy Goose USA. Ltd.*, 581 F. Supp.

2d 606, 620 (S.D.N.Y. 2008) ("The party seeking to evince the existence of a joint venture must

establish each of the[] elements."); *Allen Chase & Co. v. White, Weld & Co.*, 311 F. Supp. 1253,

1260 (S.D.N.Y .1970) ("Perhaps the most important criterion of a joint venture is the joint

control or management.").  "The control deemed essential for a joint venture is power over

decision making."  *Stratford Group, Ltd. v. Interstate Bakeries Corp.*, 590 F. Supp. 859, 863

(S.D.N.Y. 1984).

From the email exchange between Barberi and Rosen on or around October 11, 2017, it is

clear that the initial idea to buy and resell the Kandinsky was Chowaiki's and that he was the

party that had the expertise necessary to carry out the transaction.  Am. Compl.  ¶ 11.

Additionally, it was Chowaiki who was wholly responsible for finding a potential client to whom

the Kandinsky could be resold.  Neither Rosen nor Barberi had any role in negotiating a resale

price with said client.  Id. ¶14.  Indeed, Rosen acknowledged that "the identities of any potential

33

buyer or seller remained a secret known only to Chowaiki." Opp, Memo. at 15.  Aside from

investing a portion of the funds into the transaction, Rosen alleges that he had no input as to how

the deal would be directed, and merely stood to make a profit on his initial investment once

Chowaiki had concluded the proposed transaction.  In view of the foregoing, the complaint

wholly fails to describe Rosen as anything other than a passive investor who had no right to

direct or control the transaction in any way.  *See McGhan v. Ebersol,* 608 F. Supp. 277, 284

(S.D.N.Y. 1985) (a party's inability to exert control over another's decision-making demonstrates

that joint control is lacking).  As such, any argument that an imposition of a constructive trust is

warranted by reason of a joint venture cannot overcome Plaintiff's failure otherwise to state a

plausible claim for relief in Count III.


# CONCLUSION

For the reasons set forth above,[11] Plaintiff has failed to state a claim upon which relief

can be granted and the Motion to Dismiss is granted.

It is so **ORDERED.**

Date:   New York, New York
        November 16, 2018

                                                    *s/ Mary Kay Vyskocil*
                                                    Honorable Mary Kay Vyskocil
                                                    United States Bankruptcy Judge

---

[11] The Court has considered the Trustee and Rosen's remaining arguments, and to the extent not specifically
addressed herein, concludes that they lack merit.

34